217 So.2d 182

**STATE of Louisiana**

**v.**

**James COLLINS, Jr.**

No. 49266.

Dec. 16, 1968.

Walton J. Barnes, Robert J. Jones, Baton Rouge, for defendant-petitioner.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Asst. Atty. Gen., Sargent Pitcher, Jr., Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for appellee.

McCALEB, Justice.

Appellant and one Judith White, two young Negroes, were indicted by the Grand Jury for the Parish of East Baton Rouge for the murder of Charles Bashful.

Judith White was granted a severance and, thereafter, appellant was tried and found guilty as charged by the jury. Following imposition of the death sentence, he prosecuted this appeal, relying on ten of the fourteen bills of exceptions reserved at the trial for a reversal of his conviction. The facts essential to a discussion of the bills are as follows:

Charles Bashful, an 82 year old Negro man, was found brutally beaten with a crowbar at his home in Baton Rouge on the night of December 5, 1964. He died from the injuries sustained by him some two weeks later without ever having re-gained consciousness. Missing from his home was a P–38 caliber pistol, a portable television, a ring and a watch. Forcible entry was allegedly secured into the Bashful dwelling by the breaking of a windowpane in a door on the porch.

On December 18, 1964 the police were summoned to investigate a complaint of disorderly conduct by two Negroes, a man named Latimore and one Louise Washington. When arrested Latimore was found in possession of a pistol which, upon investigation, was discovered to be the P–38 taken in the Bashful burglary. Upon interrogation respecting the ownership of the pistol, Louise Washington told the officers that another Negro named Jerry Hartford had brought it to her a few days before her arrest and requested that she hold it for him. The police located Jerry Hartford, and he informed them that he had secured the pistol from appellant, James Collins, who hocked it to Hartford for $12.00. The police then apprehended appellant on December 18, 1964 and brought him to the city police station for questioning.

The exact time of the beginning of the interrogation of appellant is not certain, but all officers involved therein agree that it began around 9:00 or 9:30 P.M. on the night of December 18, 1964 and continued, with certain interruptions made necessary to check on appellant's statements to the officers, until about 4:00 A.M. of Decem-

ber 19, at which time appellant gave a certain inculpatory written statement as to his participation in the burglary of the Bashful residence with Judith White, culminating in the infliction of the fatal blows administered to Bashful from which he subsequently died.[1]

Although, as stated above, appellant's counsel are relying on ten of the fourteen bills of exceptions, which they have grouped into three special contentions in this Court, the most important of all, in fact the only complaint which may have merit, is directed to the admissibility of the inculpatory statement given by appellant at about 4:00 o'clock on the morning of December 19, 1964. The bills referring to the admissibility of this statement are numbers 9, 10, 12 and 13, and attached thereto and made part thereof is all of the evidence taken at the laying of the foundation for the admission of the statement and also to the overruling of counsel's objections to the reception of the statement in evidence before the jury.

In approaching discussion of the admissibility of the inculpatory statement, it is to be borne in mind that the Bill of Rights

of our Constitution provides in Section 11 of Article I that no person shall be compelled to give evidence against himself in a criminal case " * * * or in any proceeding that may subject him to criminal prosecution, * * *" and it further declares, "No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made."[2]

Under this provision and R.S. 15:452 quoted in full in footnote two and R.S. 15:451,[3] this Court has held in a long list of cases too numerous to cite that the burden of proof rests with the state to show by a clear preponderance of evidence (and in some cases it is held that the state is obliged to establish beyond a reasonable doubt—see State v. Honeycutt, 216 La. 610, 44 So.2d 313; State v. Ferguson, 240 La. 593, 124 So.2d 558 [on rehearing] and authorities there cited; and State v. Carter, 248 La. 730, 181 So.2d 763) that the inculpatory statement in all of its aspects was freely and voluntarily given. Furthermore, since the trial of this case began on May

---

1. In his statement appellant declares that it was Judith White who struck Bashful on the head with the crowbar which he said she held in her left hand, but before she hit him " * * * she changed the crowbar to her right hand."
2. Substantially the same provision is embodied in R.S. 15:452 which states: "No person under arrest shall be subjected to

any treatment designed by effect on body or mind to compel a confession of crime."
3. It reads: "Before what purposes (purports) to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."

10, 1965, subsequent to the ruling of the Supreme Court in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, but before Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, it is subject to the guidelines set forth in the former but not to those pronounced in the latter.

The testimony adduced by the state, outside of the presence of the jury, to establish the voluntariness of the inculpatory statement given by appellant consists of the evidence of Detectives Rouse and Sansone of the Baton Rouge Police Force, who interrogated appellant in Room 120 at the city police station from approximately 9:30 P. M. of December 18, 1964 until 4:00 A.M. the following morning, when Officer Rouse wrote down appellant's statement of complicity in the perpetration of the crime. The gist of these officers' testimony is that appellant gave the statement voluntarily, and that he was not subjected to any intimidation, menaces, improper treatment or inducements which is, in reality, their

conclusion from the facts elicited from their narration of the circumstances under which the statement was secured.

However, the two officers, who had complete charge in the questioning, do not agree with each other as to certain facts. For example, Detective Rouse stated that during the interrogation, which lasted intermittently for a period of over six hours, appellant said he had acquired the pistol, which had been taken from the decedent's home, from another Negro named Louis Clark, who was known as "Crow." He further declared that appellant had emphatically denied participation in the burglary of the decedent's home until between 3:00 and 4:00 o'clock in the morning when other police officers located Crow in the Parish Jail and brought him over to the interrogation room where Crow confronted appellant. This confrontation, according to Detective Rouse, caused appellant to abruptly change his story[4] and agree to give the inculpatory statement.

---

4. We note at this point that Crow, who testified for the state at the trial, declared that he was brought down to the interrogation room by Captain Gunby, another city police officer. Yet, although it is evident that Captain Gunby was present and a witness to Crow's statement (to the effect that if they would put him in the same room with appellant for five minutes "one of us will tell the truth" which, according to Rouse, caused appellant to change his story about the pistol and confess), we find it strange that Captain Gunby was not called as a witness at the time the foundation was laid for the admission of the confession in evidence to corroborate the testimony of Rouse. Albeit it is not essential to our decision here, it would appear that the failure of the state to produce Captain Gunby is contrary to our holding in State v. Honeycutt, 216 La. 610, 44 So.2d 313, where it was held that all officers present and available before and at the time a confession has been given should be produced in order to afford the trial judge a better opportunity to weigh and decide whether the confession has been freely and voluntarily made.

Detective Sansone, on the other hand, after stating that he and Rouse were the officers in charge of the interrogation of appellant, and that the latter gave the statement voluntarily following hours of questioning, denied during his sworn statement, out of the presence of the jury, that there was any confrontation between Crow and appellant whatsoever, despite the fact that Rouse had testified that it was this confrontation which prompted appellant to give the statement.

However, after the judge ruled the statement was admissible, Sansone appeared on the witness stand before the jury and identified the statement as being freely given. At this time, he changed the story he had given when the state was laying the foundation for the admission of the confession in evidence. In essence, he declared, after referring to his written police report, that Detective Rouse was correct when the latter had said that there was a confrontation between appellant and Crow and that appellant had agreed to give the inculpatory statement immediately after the confrontation.

It is inconceivable to us why Sansone changed his testimony in this important respect. For he was asked not once but several times by defense counsel, while on cross-examination during the laying of the foundation for the admission of the statement, whether there had been any confrontation between appellant and Crow. To each question, he replied in the negative.

If this was all with respect to Sansone's testimony, we might be able to conclude that his change in statement was merely a misinterpretation of the question propounded to him, as he attempted to explain in this manner while testifying before the jury. But there are other portions of his testimony, and also Rouse's testimony, which create some doubt in our minds that their statements as to the voluntariness of the confession are fully supported by the facts on which their conclusions are based. To illustrate, Sansone freely admits that he called appellant a "Nigger" on several occasions during the hours of interrogation. And he also concedes that he used profanity in his questioning although he explains that the profanity was not harsh, but "It was maybe a little more than an average tone of voice." Of course, he denies that the use of the appellation "Nigger" was intended to intimidate appellant or to hasten obtention of the desired confession. But it occurs to us that Sansone, the senior detective in charge of the interrogation, by employing profanity and name calling, must have intended that the epithets would produce some effect on the mind of appellant.

Appellant's testimony in rebuttal of the state's claim that the inculpatory statement was voluntary is that he had been beaten in the temporary lockup by Sansone. This is, of course, vehemently denied by San-

sone, and the district judge fully accepted the latter's testimony. While we do not question the ruling of the judge in this respect,[5] we reiterate that the burden was on the state to show that the confesssion was voluntary and, assuming that appellant falsified when he declared that he was beaten by Sansone, this still does not relieve the state of the burden of establishing from the totality of the circumstances a state of facts from which the conclusion is inescapable that there was nothing done by the officers to instill in the accused fear, intimidation or compulsion in body or mind at the time the statement was given.

■ Moreover, there are other circumstances which must be considered. Since this case is governed by the doctrine in the Escobedo case, counsel for appellant directed questions to the officers calculated to show that the inculpatory statement was secured in violation of the guidelines of the Supreme Court pronouncement. We have several times held that the Escobedo case applies, as here, when the party involved has been arrested, the investigation has focused on him as the suspect, the police have carried out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied the opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional

right to remain silent. See State v. Johnson, 249 La. 950, 192 So.2d 135; State v. Ahrens, 250 La. 391, 196 So.2d 250; State v. Fox, 251 La. 464, 205 So.2d 42; and State v. Page, 251 La. 810, 206 So.2d 503. See also Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, where the Court construes its holding in the Escobedo case to be restricted to the circumstances above stated.

In the instant case, appellant testified that he requested an attorney but was told that he did not need one. Detective Sansone was asked on cross-examination whether such a request was made and he replied in the negative. However, he stated it is his impression that something was said about a lawyer and that " * * * Detective Rouse mentioned that fact to him" (evidently meaning appellant). And, when asked if he recalled whether anything had been done about a lawyer, he answered that, while he did recall that mention of a lawyer was made, he did not state to appellant (as the latter had testified) that when he, Sansone, got through with him he would not need an attorney.

On direct examination, in the laying of the foundation for reception of the confession, Detective Rouse was not asked whether appellant had requested an attorney. However, Rouse was questioned on cross-examination in rebuttal whether ap-

---

5. Appellant also denied confrontation with Crow in the interrogation room. He says

he did not see Crow until he was brought "upstairs."

pellant requested a lawyer. He replied that he, Rouse, asked appellant if he had a lawyer and that he does not remember if appellant stated that he had a lawyer or if he mentioned a name. He was then asked the following questions:

"Q. Officer Rouse, who first mentioned the word or the proposition of geting a lawyer? Was that your recommendation to help this man?

"A. I didn't—I couldn't say for sure whether I told him or he mentioned it.

"Q. Did you tell him he didn't have to give a statement, he could call a lawyer?

"A. I told him that he didn't have to. If he did I would write it down like he said.

"Q. And he had a choice of calling a lawyer or not calling a lawyer, is that what you say?

"A. I couldn't say if those were the exact words. I did mention a lawyer to him. I believe it was to the effect did he have a lawyer."

■ It is seen from the foregoing that both Sansone and Rouse are quite indefinite regarding appellant's alleged request for a lawyer. Sansone vaguely remembers that something was said about a lawyer, but Rouse, who was more specific, cannot remember the context of the language used indicating, however, in one part of his testimony he asked appellant whether he had a lawyer, yet in another portion he states that he told appellant he could call a lawyer but that he did not have to because he would write down the statement just as appellant would give it to him. Viewing the testimony as a whole, it appears to us that the two officers have not successfully rebutted appellant's statement that he requested a lawyer. And, since both officers concede that appellant was not advised of his constitutional right to remain silent, we conclude that the admission of the inculpatory statement in evidence was violative of the pronouncement in Escobedo v. Illinois. We also express the view, as we have above indicated, that we doubt the state has carried the burden of showing with the degree of certainty required by our law and jurisprudence that the inculpatory statement was not made under the influence of fear, intimidation or menaces. Accordingly, the case must be remanded to the district court for a new trial.

In view of our holding, it would normally not be necessary to give consideration to the other bills taken in the case. Nevertheless, because of the possibility that similar objections and exceptions may be reserved when the case is retried, we think it it apt to state that we have considered the bills which do not relate to the confession herein, and find no merit in them.

For the reasons assigned, the conviction and sentence herein are annulled and set aside and the case is remanded to the district court for a new trial.

HAMITER, J., concurs in the result.

SANDERS, J., concurs with written reasons.

SUMMERS, J., dissents with written reasons.

BARHAM, J., concurs.

SANDERS, Justice (concurring).

As I appreciate the evidence, the law enforcement officers advised the defendant of his constitutional right to remain silent, and the defendant made no request to see an attorney. Hence, the officers were guilty of no violation of the principle announced in Escobedo v. Illinois. See State v. Page, 251 La. 810, 206 So.2d 503 and State v. Johnson, 249 La. 950, 192 So. 2d 135.

Defendant, in his own testimony, firmly denied the assertion that he was threatened or confronted by Louis Clark alias "Crow." Hence, since defendant felt no intimidation from this source, this charge of coercion must be rejected. But, the other aspects of the mistreatment charge call for more specific testimony from the State's witnesses.

The record reflects that five police officers were present at various times during the period preceding the confession. Two of these, Captain Gunby and Officer Mack, were not called as rebuttal witnesses by the State. The State offered no explanation for their absence. Without their testimony, the evidence as to the voluntariness of the confession is left in an unsatisfactory state. Hence, on this ground only, I concur in the granting of a new trial. See State v. Honeycutt, 216 La. 610, 44 So.2d 313 and State v. Green, 221 La. 713, 60 So.2d 208. See also footnote 4 of the majority opinion.

For the reasons assigned, I concur in the decree.

SUMMERS, Justice (dissenting).

I do not agree that the State has failed to establish the free and voluntary character of the defendant's confession. All of the evidence pertaining to the foundation the State was required to lay for the introduction of the confession is attached to Bill of Exceptions No. 9. From that evidence the trial court was satisfied that the written confession or inculpatory statements were freely and voluntarily given by the accused. The trial judge's ruling was based entirely upon the credibility of the witnesses, and in his per curiam he stated emphatically that he did not believe de-

fendant's testimony about being mistreated while being interrogated by the officers. .

How this court can disregard the finding of the trial court on the question of the credibility of witnesses, disregard the testimony of officers Rouse, Sansone, Mack and Cummings and accept the testimony of the accused alone and thereby set aside this conviction is difficult for me to comprehend.

The majority rests its finding primarily on the fact that there was a discrepancy in the testimony of Detective Sansone and the fact that Sansone called the defendant "Nigger" on several occasions during the interrogation.

The trial court was satisfied that the discrepancy in Sansone's testimony was due to a misunderstanding of a question put to him, a not uncommon occurrence during a trial with which the majority seems to agree. But the absurd position taken by the majority that referring to the defendant, a hardened criminal, undoubtedly guilty of a brutal slaying, as a "Nigger" could intimidate him and compel his confession to a capital offense, defies comprehension. This effete attitude of the court is entirely divorced from reality and if continued can only lead to a complete breakdown in the processes of criminal prosecution and punishment for crime.

I respectfully dissent.