307 So.2d 317 (1975)
STATE of Louisiana
v.
William August MORA, Jr.
No. 54884.
Supreme Court of Louisiana.
January 20, 1975.
Rehearing Denied February 21, 1975.
*318 Guy J. D'Antonio, II, Reed, Reed & D'Antonio, Metairie, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Knowles M. Tucker, Dist. Atty., Bernard E. Boudreaux, Jr., Asst. Dist. Atty., for plaintiff-respondent.
BARHAM, Justice.
Relator was convicted of possession of marijuana, a violation of La.R.S. 40:966C, and was sentenced to six months' imprisonment in the parish jail. We granted certiorari upon relator's application to review the trial court's denial of a motion to suppress the marijuana which formed the basis of the prosecution and a motion to suppress a confession. We find merit in relator's arguments alleging error in the trial *319 court's ruling on his motion to suppress the marijuana and we therefore pretermit consideration of relator's other comlpaint.
At the time that the marijuana was seized, relator was a seventeen-year-old high school senior who was participating in a physical education class at the school he attended. Each participant changed from street clothes to gym clothes before joining in the class activities and, in accordance with a customary practice, placed his wallet and other valuables in an individual small canvas bag provided for that purpose. Once the small valuables bags were filled, they were all placed in a large duffel bag which was locked for safekeeping in the instructor's office for the duration of the class.
On the day of the search and seizure, relator obtained his small valuables bag from the instructor. The instructor testified at the hearing on the motion to suppress that the relator turned his back while filling the canvas bag, that his actions were furtive, and that he experienced some difficulty in placing his wallet, which appeared to be bulky, into the small canvas bag. Once the small valuables bag had been placed in the duffel bag, the instructor locked the duffel bag in his office. The instructor further testified that after reflecting on relator's furtive actions and considering them in light of his knowledge that some of relator's companions were narcotics users and that there was talk of the use of drugs by different student groups, he decided to inspect the contents of relator's wallet. When he opened the wallet, he found a plastic bag which contained a leafy green substance. Believing the substance to be marijuana, he summoned the school principal. The principal concurred in the instructor's belief and notified the juvenile authorities, to whom the marijuana was ultimately released. Relator's prosecution ensued and the motion to suppress the marijuana was heard and denied.
The Fourth Amendment to the United States Constitution and Article I, § 7 of the Louisiana Constitution of 1921 (in effect at the time of the search in question) safeguard persons from unreasonable searches conducted without a warrant. However, the applicability of these constitutional prohibitions against unreasonable searches and the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) is limited to cases where the seizure is effected by governmental agencies. Concomitantly, the fruits of searches and seizures conducted by private persons are not subject to exclusion. See e.g., Barnes v. United States, 373 F.2d 517 (5th Cir. 1967). See also Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Therefore, before we can decide the constitutionality of the search itself, we must initially determine whether the instructor and the school principal who effected the search and seizure were functioning as private persons, exempt from the stricture of the constitutional provisions, or as governmental agents, subject to those provisions.
Principals and instructors, like others employed by the State through its school boards, are responsible for public education in this State and are charged with the responsibility of implementing the policies of the State in this respect. By state law a teacher is authorized to hold each pupil strictly accountable for disorderly conduct at school. A principal may suspend from school any pupil who is guilty of willful disobedience or who uses tobacco or alcholic beverages in any form in school buildings or on school grounds or whom commits any other serious offense. La.R.S. 17:416. Because of the function of these school officials and their strict accountability to the State, we must conclude that these school officials, insofar as they are discharging their duties by enforcing State policies and regulations, are within the purview of the Fourth Amendment's prohibition; therefore, their students must be accorded their constitutional right to be free from warrantless searches and seizures.
*320 We must now consider whether the search and seizure effected by these State officials violated the constitutional stricture against unreasonable searches and seizures and whether suppression of the seized marijuana was consequently mandated under Mapp.
"The general rule is that a search conducted without a warrant is per se unconstitutional. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) * * *" State v. Tant, 287 So.2d 458, 459 (La.1973). However, it is possible for a search without a warrant to be constitutional, if and only if it falls within one of those categories recognized as "specifically established and well-delineated exceptions" to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), citing Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). Two examples of such exceptions are searches incident to a lawful arrest and certain automobile searches.
We hold that a search on school grounds of a student's personal effects by a school official who suspects the presence or possession of some unlawful substance is not a "specifically established and welldelineated" exception to the warrant requirement and that the fruits of such a search may not be used by the State prosecutorial agency as the basis for criminal proceedings.
For the reasons assigned, the relator's motion to suppress is maintained and his conviction and sentence are reversed.
SUMMERS, J., dissents and assigns reasons.
SANDERS, C. J., and MARCUS, J., dissent for reasons assigned by SUMMERS, J.
SUMMERS, Justice (dissenting).
I cannot agree with the majority. I would decide this case as follows:
Certiorari was granted to review the trial judge's ruling denying a motion to suppress marijuana on the ground that it had been obtained as a result of an unlawful search and seizure and to review his ruling denying a motion to suppress a confession on the ground that it was not made freely and voluntarily.
Defendant was charged by bill of information with possession of marijuana. La. R.S. 40:966C. Prior to trial, defense counsel filed motions to suppress marijuana confiscated by the State on the ground that it had been obtained by an unlawful search and seizure. He also filed a motion to suppress defendant's confession, alleging that it was not free and voluntary. Hearings were held and both motions were denied. After trial by the court without a jury, defendant was found guilty on December 12, 1973 and sentenced to serve six months in the parish jail. On defendant's application, writs were granted to review the ruling denying the motions to suppress the marijuana and the confession.

I

The Search and Seizure
Defendant was a high school student on March 22, 1973 when this offense occurred. At the time he was seventeen years old. Coy Scott, the physical education instructor, a member of the high school faculty, was conducting an early morning class in physical education in which defendant was enrolled. In accordance with a practice customarily followed, before each class, as they were "dressing out", students wishing to do so placed their wallets, watches and other small, valuable personal effects in small individual canvas "valuables or P.E. bags" furnished by the school. The bags were then turned over to the instructor in charge of the class who, in turn, placed them in a large duffle bag. This bag was then locked in the instructor's office for safekeeping while the class was in progress. Experience had taught that this practice reduced pilfering.
*321 On the day in question, defendant obtained his canvas valuables bag from Scott's desk and furtively turned his back while inserting his wallet. Scott observed defendant's furtive actions and the fact that his wallet was bulky, causing defendant to experience some difficulty in his nervous effort to put the overstuffed wallet into the bag. When defendant turned his valuables bag in. Scott placed it in the larger duffle bag and locked it in his office. Later, while the class was in session, Scott reflected upon this incident and the fact that "during this time, there had been several of the kids speaking of the different groups using drugs", and further, because, he said, "During this time, we had had several cases of drugs being used; and, of course, we had completed a drug seminar, and we had been cautioned many times to keep our eyes open for anything that may be suspicious going on at school. . . ." In addition, he had been informed that some of defendant's friends, or students he ran with, were narcotic users.
Persuaded by these circumstances and his concern over the presence of dangerous drugs on the school premises, Scott returned to his office to inspect defendant's valuables bag. When he opened the wallet, he found a plastic bag containing a leafy green substance. Believing that it was marijuana, he put the wallet back and reported his discovery to Dan Brumfield, the school principal. Donovan Pontiff, the supervisor of instruction, was called into the case by the principal and together, in the coach's office, the three examined the wallet which was found to contain defendant's driver's license and the green substance. Pontiff, also the school's drug coordinator, recognized the green substance in the wallet as marijuana.
Defendant's father was summoned to school. When he arrived it was recommended that he take his son to the juvenile officer attached to the sheriff's office. The principal then delivered the plastic bag containing one-half lid of marijuana and one cigarette to the juvenile officer. Meanwhile defendant and his father drove in the father's car to the sheriff's office in compliance with the advice of the school principal.
The Fourth Amendment to the United States Constitution, Article I, Section 7, of the Louisiana Constitution and the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) have long been viewed "as a restraint upon the activities of sovereign authority, and. . . not . . . a limitation upon other than governmental agencies". Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). In short, these are limitations upon the exercise of State authority and they are inapplicable to private persons.
The rationale for the rule which allows unlawfully seized evidence by private individuals to be admitted, aside from the fact that it is not unconstitutional, is the notion that private individuals would not be deterred by an exclusionary rule. Ann. 36 ALR 2d 553, 559. Thus the exclusionary rule only applies to this search by the coach and school principal if their actions be considered the actions of state officials. State v. Kemp, 251 La. 592, 205 So.2d 411 (1968); State v. Evans, 249 La. 861, 192 So.2d 103 (1966).
It is axiomatic that the protection of the Fourth Amendment is not restricted to dwellings. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L. Ed. 374 (1930). A depository such as a locker or even a desk is safeguarded from unreasonable searches for evidence of a crime. United States v. Blok, 88 U.S.App. D.C. 326, 188 F.2d 1019 (1951). Under this rule defendant's valuables bag is protected from unreasonable search and seizure.
Equally well recognized is the principle that "students in schools as well as out of school are `persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they *322 themselves must respect their obligations to the State." Tinker v. Des Moines Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). This principle denies that a student sheds the cloak of constitutional protection at the schoolhouse door. To the contrary, "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L. Ed.2d 231 (1960). It is essential that the youth of this nation learn that the magnificence of our Constitution is founded upon genuine rights and not mere platitudes. The Bill of Rights applies to juveniles. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1967).
Decisions of this Court are not rendered in a vacuum. I believe it to be widely accepted that school authorities are impressed with the obligation to maintain discipline over the students committed to their charge. Common experience requires a recognition that when large numbers of teenagers are gathered together in such an environment, their inexperience and lack of mature judgment will often create hazards to those in the group. Parents who surrender their children to schools in order that they may continue to develop intellectually and socially have a right to expect certain safeguards. The school environment presents "special characteristics" which must determine the light in which constitutional principles are applied. Tinker v. Des Moines, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).
It is particularly during the high school years of their children when parents are justifiably concerned that they not be unduly subjected to antisocial behavior, especially the illegal use of dangerous drugs. The inquisitive nature, daring, and susceptibility to suggestion of high school students increases the danger in this sensitive area. These conditions require that school authorities investigate any charge or reasonable suspicion that a student is using or possessing narcotics. Appropriate steps must be taken if the evidence substantiates the charge or suspicion. Unattended by vigilant school authorities imposing proper discipline and restraint, the use of drugs could proliferate like wildfire. People v. Overton, 20 N.Y.2d 360, 283 N.Y.S.2d 22, 229 N.E.2d 596 (1967); reargued and affirmed 24 N.Y.2d 522, 301 N.Y.S.2d 479, 249 N.E.2d 366 (1969).
It is necessary to first decide whether the school coach who made the search and the principal who made the seizure are officials whose actions are governed by the Fourth Amendment of the United States Constitution and Article I, Section 7, of the Louisiana Constitution. The Fourth Amendment, as made obligatory on the States by the Fourteenth Amendment, protects the citizen against the State itself and all of its creaturesschool boards and school officials not excepted. West Virginia v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).
The State and the school boards, its creatures, govern and conduct public schools. Principals, coaches and teachers are charged with carrying out the policies of the State in this respect. Every parent, tutor or other person residing within the State of Louisiana having control or charge of any child between the ages of seven and fifteen is compelled by State law to send the child to school and assure his attendance under penalty of fine or imprisonment, or both. La.R.S. 17:221. By State law every teacher is authorized to hold every pupil to a strict accountability for disorderly conduct at school. School principals may suspend from school any pupil who, among other things, is guilty of willful disobedience or who uses tobacco or alcoholic beverages in any form in school buildings or school grounds; or who commits any other serious offense. La.R.S. 17:416. And the state board of education is required to prescribe a course of study on the evils and injurious effect on the human system of the use of alcohol and narcotics. La.R.S. 17:262-265. It is necessary to conclude, therefore, that school authorities, *323 principals, teachers and coaches, while enforcing State policy and regulations come within the contemplation of Fourth Amendment guarantees, and that they must respect the rights of students against unreasonable searches and seizure. The identical standard is established by Article I, Section 7, of the Louisiana Constitution. In re the Interest of G.C., 121 N.J.Super. 108, 296 A.2d 102 (1972).
This does not mean, however, that the entire law of search and seizure as it applies in criminal law is automatically incorporated into the school system of this State. The Fourth Amendment's proscription that the citizen not be subjected to unreasonable searches and seizures, does not require that a reasonable search be invalidated.
It is apparent from the language of the Fourth Amendment that a valid search warrant may only be issued upon an affidavit or complaint which sets forth facts establishing probable cause. There are instances, however, in which the police are permitted to make arrests and searches without first obtaining a warrant. In such instances it is the Fourth Amendment protection against "unreasonable searches and seizures" which is directly applicable. But, because a "principal incentive" for the procurement of warrants would be destroyed if police needed less evidence when acting without a warrant, the requirements in such instances "surely cannot be less stringent" than when a warrant is obtained. Won Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is correct to say, therefore, that probable cause is also required for warrantless arrests and searches, and the standard of reasonableness or probable cause for a search and seizure is the same for an arrest.
At the same time certain kinds of searches and seizures, because they involve a lesser degree of intrusion or interference, are permitted upon less than the traditional amount of probable causeCamara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) building inspections by city housing inspectors; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) stop and frisk; Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) detention for fingerprinting; Henderson v. United States, 390 F.2d 805 (9th Cir. 1967) border searcheven mere suspicion not required to search bags and vehicles; Kamisar, et aux, Modern Criminal Procedure p. 228 West Pub. Co. (1974).
Against this background stands the doctrine of in loco parentis recognized by Article 220 of the Civil Code:
"Fathers and Mothers may, during their life, delegate a part of their authority to teachers, schoolmasters and others to whom they entrust their children for their education, such as the power of restraint and correction, so far as may be necessary to answer the purposes for which they employ them.
"They have also the right to bind their children as apprentices."
In all schools of Louisiana it is accepted custom that the mere act of the parent in sending his child to school is implied authority to the teacher to correct the child so far as may be necessary to answer the purposes for which the teacher was employed. Op.Atty.Gen. 1934-36, p. 221.
Not only in Louisiana but generally throughout the Nation, a school teacher stands in the place of a parent to his students. He may exercise such authority and control, restraint and correction as may be reasonably necessary to enable him to perform his duties as teacher and accomplish the purposes of education. And his power and duty extend beyond the teaching and preservation of order and discipline to matters affecting the morals, health and safety of the students. See authorities cited in 79 C.J.S. Schools and School Districts § 493.
*324 Government interest both national and state in requiring that the traditional tests of reasonableness be applied to searches and seizures is to be balanced against the compelling interest of the state in preserving the doctrine of in loco parentis in the school communities of the land; the public necessity and the fundamental social concept the doctrine represents antedating the Fourth Amendment demand its preservation. To reconcile these divergent interests and preserve the essential merits of each, in the narrowly defined area of the school community, a standard of reasonable suspicion rather than the traditional probable cause to justify a search is warranted by the "distinct relationship" between the high school official and the student. Other jurisdictions have approved such a rule. People v. Jackson, 65 Misc.2d 909, 319 N.Y.S.2d 731 (1971) and State of Delaware v. Baccino, 282 A.2d 869, 49 A.L.R.3d 953 (Del.Super.1971). Cf. Mercer v. State, 450 S.W.2d 715 (Tex.Civ.App. 1970) holding that since the principal was acting in loco parentis, he was not an arm of the government. See also 49 A.L.R.3d 980.
In applying these principles to the facts of this case, I am satisfied that the coach who made the initial intrusion into defendant's privacy by opening his valuables bag had a reasonable suspicion to believe that the valuables bag contained prohibited dangerous drugs.
Defendant's furtive gesture while nervously inserting his wallet in the valuables bag considered in connection with the coach's knowledge that defendant associated with drug users; the fact that "several cases of drugs being used" at the school were known to the coach; and the knowledge he undoubtedly acquired at the drug seminars invested the furtive gesture with such guilty significance that a rational suspicion existed. Thus the standard of probable cause for the search applicable to this case was satisfied. The furtive gesture has in other cases served to provide reasonable grounds for a search. People v. Orr, 26 Cal.App.3d 849, 103 Cal.Rptr. 266 (1972); Gallik v. Superior Court of Santa Clara County, 5 Cal.3d 855, 97 Cal.Rptr. 693, 489 P.2d 573 (1971); People v. One Chevrolet Impala, 219 Cal.App.2d 18, 33 Cal.Rptr. 64 (1963).
Not only is the search justified by this rational and reasonable suspicion, but the circumstances imposed upon the coach the duty to proceed as he did under his obligation in loco parentis, not only to correct the breach of discipline but to protect the student body as a whole from the unwholesome drug traffic threatening the school.
There is, moreover, an element of consent to this search which arises from the in loco parentis status and authority the parent delegates to teachers when he sends his children to school. No one would say the parent could not make such a search, and, logically, the parent consents that this authority is transferred to and vested in the teacher. For the teacher to fail to carry out the corresponding responsibility would itself amount to malfeasance. Also to be considered in justification of this search is the fact that defendant surrendered possession of his wallet containing the marijuana to Scott the coach and with it the implied consent to inspect.
The search and seizure satisfied constitutional requirements.

II

The Confession
When defendant and his father arrived at the sheriff's office, they reported to Officer Keenze, the juvenile officer. Officer Keenze immediately advised defendant, in his father's presence, of his rights, reading to him the Miranda warnings. Questioning of defendant then commenced. He was giving a statement, when Officer Keenze heard Detective Graffeo enter the office next door. Realizing that defendant was seventeen years old and was to be accorded the same treatment adults receive in criminal matters, Officer Keenze requested *325 that Detective Graffeo conduct the interrogation. Despite the fact that he was not to have the benefit of the law applicable to juveniles, defendant's father was permitted to remain with him during the interrogation that followed.
Detective Graffeo again advised defendant of his rights, and within ten or fifteen minutes he made a complete statement confessing to the possession and use of the marijuana and the source from which it was obtained. Thereafter the confession was reduced to writing by defendant in his own hand. The paper provided for the confession contained a printed acknowledgement that defendant had been advised of his rights under the Fifth Amendment to the Constitution as to compulsory selfincrimination, his right to counsel and his right of trial, and that what he said could be used against him in a court of law, and that the statement was voluntarily made. The statement was witnessed by the two officers and defendant's father. I quote the pertinent content of the document for the bearing it has upon the free and voluntary character of the admission.
"I have been using marijuana for one year. I started out with Keith Clements and I smoked several cigarettes with him and bought a few from him two weeks latter (sic) bought a cupple (sic) more from him and smoked them and I was caught with a ledd (sic) in willet (sic) at school in P.E. bag.
"I gave Keith Clements $10.00 for two match boxes last week at school which had marijuna (sic) in it. 3/19/73.
"The marijuna (sic) I was caught with was marijuna I bought from Keith Clements."
According to the police, the entire interrogation consumed 35-40 minutes. We learn from their testimony that defendant and his father are full-blooded Chitamacha Indians who live on a reservation near Charenton, Louisiana. The father has the equivalent of a fourth grade education. This background, it is asserted, makes defendant and his father easily susceptible to intimidation. Another factor improperly inducing the confession is said to result from the fact that the police assured them that if defendant confessed, they would go easy on him, he would be brought before a lenient judge, his sentence would not exceed thirty days and they would see to it that defendant served his time as a trustee working in the prison kitchen. Furthermore, it is contended, defendant was intimidated by the father's threat to punish him if he didn't tell the police what they wanted to know.
On the other hand, Officers Keenze and Graffeo testified positively that they made no promises to defendant and the facts support their version of what occurred. Defendant and his father went to the sheriff's office on instructions from the principal; they did so freely and voluntarily, without having been arrested or taken into custody. After arrival at the sheriff's office, defendant promptly confessed, wrote out his confession, and signed a waiver of rights after the Miranda warnings were twice repeated by the officers. The confession and waiver document was signed by defendant and witnessed by both officers and defendant's father. At no time did the father or son protest the treatment they received nor did they demonstrate any attitude except one of cooperation with the officials.
On this issue, I am satisfied that the question this record presents is one of credibility of the witnesses. The version of the two state witnesses is supported by the physical evidence and the undisputed surrounding circumstances. Moreover, the trial judge who heard and saw the witnesses accepted the testimony of the police officers. Defendant's and his father's testimony differ only insofar as the promises they claim were made by the officers, otherwise the essential facts are not disputed.
The State has discharged its burden of affirmatively establishing the free and voluntary *326 nature of the confession; it was, therefore, admissible in evidence. La. Const. art. I, ¶ 11; La.R.S. 15:451-452; Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); State v. Cripps, 259 La. 403, 250 So.2d 382 (1971); State v. Collins, 253 La. 149, 217 So.2d 182 (1968); State v. Carter, 248 La. 730, 181 So.2d 763 (1966); State v. Simpson, 247 La. 883, 175 So.2d 255 (1965).
Society will not long tolerate the stringent and unrealistic rule of law imposed by the majority; a rule which will prohibit the control of drug traffic on the school grounds of the State.
I respectfully dissent.